1   **LEWIS BRISBOIS BISGAARD & SMITH LLP**
    ALEXANDER J. HARWIN, SB# 225254
2     E-Mail: Alexander.Harwin@lewisbrisbois.com
    633 West 5th Street, Suite 4000
3   Los Angeles, California 90071
    Telephone: 213.250.1800
4   Facsimile: 213.250.7900

5   Attorneys for Defendant, Amplity, Inc.

6

7

8               UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11  RUKIYA GORDON, an individual,          Case No.

12              Plaintiff,                 **REQUEST FOR JUDICIAL
                                           NOTICE IN SUPPORT OF NOTICE
13          vs.                            OF REMOVAL OF CIVIL ACTION
                                           UNDER 28 U.S.C. §1441(B)
14  AMPLITY HEALTH, an unknown             [DIVERSITY OF CITIZENSHIP]**
    business entity, AMPLITY, INC., a
15  corporation and DOES 1-10, DOES 11-    Trial Date:        None Set
    20 and DOES 21-20, inclusive,
16
                Defendants.
17

18  _____

19          Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice

20  of adjudicative facts "not subject to reasonable dispute," and which are "generally

21  known within the trial court's territorial jurisdiction" or "capable of accurate and

22  ready determination by resort to sources whose accuracy cannot reasonably be

23  questioned."  Fed. R. Evid. 201(b); see Mack v. S. Bay Beer Distribs., 798 F.2d

24  1279, 1282 (9th Cir. 1986).  Furthermore, requests for judicial notice of jury

25  verdicts may be granted as "the accuracy of the jury verdicts as public records of

26  prior proceedings can be determined by readily available resources whose accuracy

27  cannot be reasonably questioned."  Vasquez v. Arvato Digital Servs., LLC, 2011

28  U.S. Dist. LEXIS 69154 at *5 (C.D. Cal. June 27, 2011.)

133462121.1

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Pursuant to Federal Rule of Evidence 201 Defendant Amplity, Inc. requests the Court take judicial notice of the following:

1.      John Quemada v. Cordoba Corporation, 2019 Jury Verdicts LEXIS 125719, State of California, Superior Court for the County of Los Angeles, Case No. BC621735 (December 9, 2019). A true and correct copy of this verdict is attached as Exhibit **A**.

2.      Wilma Ismen v. Beverly Hospital, 2008 Jury Verdicts LEXIS 29753, Sate of California, Superior Court for the County of Los Angeles, Case No. BC366198 (August 13, 2008). A true and correct copy of this verdict is attached as Exhibit **B**.

3.      Anahit Shirvanyan v. Los Angeles Community College District, 2018 Jury Verdicts LEXIS 36676, State of California, Superior Court for the County of Los Angeles, Case No. BC633224 (December 20, 2018). A true and correct copy of this verdict is attached as Exhibit **C**.

4.      Virginia Hoover v. Dignity Health, et al., 2018 Jury Verdicts LEXIS 37236, State of California, Superior Court of Ventura County, Case No. 56-2016-00481136-CU-OE-VTA (December 20, 2018). A true and correct copy of this verdict is attached as Exhibit **D**.

5.      Taylor v. City of Burbank, 2012 Jury Verdicts LEXIS 3990, State of California, Superior Court for the County of Los Angeles, Case No. BC422252 (April 9, 2012). A true and correct copy of this verdict is attached as Exhibit **E**.

6.      The contents of the foregoing court files may be judicially noticed because they are capable of accurate and ready determination to resort to public records whose accuracy cannot be reasonably ascertained.  (See Fed. R. Evid. 201(b); Simmons v. PCR Tech., 209 F. Supp. 2d 1029, 1033034 (N.D. Cal. 2002) [finding it proper to consider evidence from various jury verdict reporters to establish amount in controversy]).

/ / /

133462121.1

2

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF NOTICE OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. §1441(B) [DIVERSITY OF CITIZENSHIP]

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1         Accordingly, Defendant respectfully requests that the Court take discretionary

2    judicial notice of the contents of the above-referenced (see Fed. R. Evid. 201(c)(1)),

3    or alternatively, mandatory judicial notice of those contents based upon the records

4    supplied that are attached hereto as Exhibits **A** through **E**. (see Fed R. Evid.

5    201(c)(2)).

6

7    DATED:  February 27, 2024

8                          LEWIS BRISBOIS BISGAARD & SMITH LLP

9

10                   By:  *   /s/ Alexander J. Harwin*

11                        ALEXANDER J. HARWIN

12                        Attorneys for Defendant, Amplity, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

133462121.1

3

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF NOTICE OF REMOVAL OF CIVIL ACTION
UNDER 28 U.S.C. §1441(B) [DIVERSITY OF CITIZENSHIP]

# EXHIBIT "A"

## *John Quemada v. Cordoba Corporation; 2019 Jury Verdicts LEXIS 125719*

BC621735

December 09, 2019

**Headline:**    Plaintiff: No accommodations provided after back injury

**Topic:** Employment - Age Discrimination - Employment - Wrongful Termination - Employment - Failure to Accommodate - Employment - Disability Discrimination

**Injury:** mental/psychological, emotional distress

**Practice Area:** Labor and Employment Law

**State:** California

**Court:** Superior Court of Los Angeles County, Los Angeles

**Plaintiff Counsel**

Keith D. Griffin

Firm Name: Girardi & Keese

Address: Los Angeles, CA

Plaintiff Name: (John Quemada)

Ebby S. Bakhtiar

Firm Name: Livingston Bakhtiar

Address: Los Angeles, CA

Plaintiff Name: (John Quemada)

Alexa F. Galloway

Firm Name: Girardi & Keese

Address: Los Angeles, CA

Plaintiff Name: (John Quemada)

**Defendant Counsel**

Kathleen M. Hartman

Firm Name: Callahan Thompson Sherman & Caudill LLP

Address: Irvine, CA"

Lee A. Sherman

Firm Name: Callahan Thompson Sherman & Caudill LLP

Address: Irvine, CA"

**Judge:** Terry A. Green

John Quemada v. Cordoba Corporation; 2019 Jury Verdicts LEXIS 125719

**Case Summary**

On March 1, 2013, plaintiff John Quemada, 52, an assistant construction manager for Cordoba Corp., was demoted to an entry-level position and required to clean a construction site. He ultimately suffered a serious work-related injury to his back, resulting in disabilities. A year later, an impartial workers' compensation doctor selected by Cordoba determined that Quemada had suffered a 24 percent permanent disability, dictating permanent work restrictions that primarily impacted Quemada's ability to sit for prolonged periods of time. However, Quemada claimed that was told that no accommodations were available and that he was not going to be allowed back to work because of his disabilities. He claimed he attempted to call the director of human resources back, but she never returned his messages. Quemada sued Cordoba Corp., alleging that the company's actions constituted wrongful termination in violation of public policy. He also alleged that the company's actions constituted a failure to engage in the interactive process, a failure to accommodate, disability discrimination, age discrimination and a failure to prevent discrimination, all in violation of the California Fair Employment and Housing Act. Quemada claimed that by 2008, he was working for Cordoba's Long Beach Community College Bond Management Team, which was responsible for administering and overseeing the Long Beach Community College Modernization Program, but that he was falsely accused of chronic poor performance in March 2013, causing him to be abruptly demoted to an entry-level position. He alleged that he was actually demoted so that a new 30-year-old employee, who was willing to take less pay, could be promoted into his job. Quemada claimed that as a result of the demotion, he was required to clean a construction site, which took several weeks to accomplish and caused his back injuries. Plaintiff's counsel contended that Quemada's demotion was not only a violation of Cordoba's own policy, which prohibited employees from engaging in manual labor, it also was a violation of the terms of Cordoba's contract with the Long Beach Community College District. Counsel also noted that, after Quemada's injury, Quemada filed a workers' compensation claim, which was the first workers' compensation claim brought against Cordoba in its long history. Plaintiff's counsel argued that after sustaining back injuries, Quemada required reasonable accommodations so that he could continue doing his job, but that the company neither engaged Quemada in the interactive process nor offered Quemada any accommodations other than a leave of absence. Counsel also argued that Cordoba's failure to accommodate Quemada aggravated Quemada's disabilities, resulting in multiple leaves of absence. During his last absence, Quemada was sent an email from Cordoba's human resources director stating that Quemada would not be allowed back to work unless he was able to perform "100 percent" of his job duties. Consequently, Quemada's doctors extended his leave of absence. After the workers' compensation finding, Cordoba admitted that it could have accommodated Quemada's permanent restrictions without any issues whatsoever. However, plaintiff's counsel contended that Quemada was never engaged in the interactive process and no accommodations were ever offered to him. Counsel contended that, instead, the human resources director left Quemada a voice message informing him that no accommodations were available and that Quemada was not going to be allowed back to work because of his disabilities. According to plaintiff's counsel, the claims notes from Cordoba's workers' compensation carrier revealed that the human resources director had reported that Quemada had suffered an injury after being asked to clean a construction site and showed that Cordoba accepted responsibility for Quemada's injuries and never challenged the validity of how he got hurt. Plaintiff's counsel also noted that the human resources director claimed that she had learned of Quemada's alleged decision to not return to Cordoba from the workers' compensation claims adjuster. However, counsel contended that the human resources director was repeatedly impeached by both her own deposition testimony and the testimony of various other witnesses, allegedly demonstrating that Quemada was never engaged in the interactive process and never offered any accommodations for his disabilities. The workers' compensation adjuster also testified to having never spoken to Quemada and that her claims notes documenting her communications with Cordoba showed that the human resources director had said that Quemada was going to be terminated because of his permanent disabilities. Defense counsel contended that the workers' compensation adjuster was later impeached, admitting that the human resources director had never actually told her that Quemada was going to be terminated. The insurance adjuster explained that her notes were a summary of the conversation that she had with the human resources director and that she assumed that Cordoba would terminate the employee because the human resources director was uncertain of Cordoba's ability to accommodate Quemada's disabilities. Defense counsel argued that during the entire time that Quemada was employed by Cordoba, Quemada received repeated written warnings that his computer skill and writing needed to improve and that Quemada did not make any improvements. Counsel also argued that, in 2013, it was necessary to make changes to job positions at the project, so Quemada was demoted. Defense counsel contended that after the demotion, Quemada's work continued to decline, so Quemada was placed on a performance improvement plan and

John Quemada v. Cordoba Corporation; 2019 Jury Verdicts LEXIS 125719

told that if his performance did not improve, he would be terminated. Defense counsel argued that just 30 days before his performance was to be reviewed, Quemada stated that he was injured on the job. The injury was handled through workers' compensation. Counsel contended that, thereafter, Quemada only returned to work for short periods for more than a year and that when he did return to work, Cordoba allowed him to sit and stand as necessary to comply with his doctor's restriction. Counsel also contended that Quemada would take himself out of work and continually provide doctor's notes placing him out of work, but that Cordoba complied with all Quemada's doctor's notes. Defense counsel argued that, ultimately, Cordoba was told by the workers' compensation adjuster that Quemada did not want to return to work and that as a result, Cordoba's human resources person called Quemada to confirm that claim. Counsel contended that as a result, the human resources director left a voice message stating the purpose of the call and asking Quemada to call her back, but she claimed she never received a call back from Quemada. Further, defense counsel noted that Quemada was unable to produce his phone records at trial to demonstrate a call was made to the human resources director. In addition, defense counsel argued that Quemada also did not try to contact anyone else at Cordoba and that Quemada was actually looking for employment at the time of the events.

**Injury Text:**     Quemada was recruited and hired by Cordoba in April 2007. He claimed that from the date of his hire until early 2013, he received nothing but positive performance reviews as well as annual merit-based pay raises, which were only afforded to Cordoba's highest performing employees. By 2013, Quemada was earning just under $92,000 annually. However, after he was terminated, Quemada claimed he was unable to find employment for approximately two full years, resulting in a loss of earnings of nearly $185,000. Quemada claimed he suffers from emotional distress stemming from his termination and inability to find work for two years. Quemada sought recovery of $185,000 in past lost earnings, an unspecified amount for future loss of earnings, and an unspecified amount of noneconomic damages for his past and future emotional distress. He also sought recovery of punitive damages for the alleged wrongful conduct of Cordoba and its managing agents. Defense counsel noted that Quemada never sought counseling and that Quemada was on his wife's insurance, so he could have received counseling.

**Insurer:**

**Plaintiff Amounts:**     ( John Quemada $1,500,000 Personal Injury: Punitive Exemplary Damages$184,686 Personal Injury: past economic damages$1,015,314 Personal Injury: past non-economic damages)

**Plaintiff Expert(s)**

Mark Falkenhagen

Address: Los Angeles, CA

Specialty: Valuation

Mark Falkenhagen

Address: Los Angeles, CA

Specialty: Valuation

Mark Falkenhagen

Address: Los Angeles, CA

Specialty: Valuation

Shahab Mahboubian, D.O.

Address: North Hollywood, CA

Specialty: Orthopedic Surgery

Shahab Mahboubian, D.O.

Address: North Hollywood, CA

John Quemada v. Cordoba Corporation; 2019 Jury Verdicts LEXIS 125719

Specialty: Orthopedic Surgery

Shahab Mahboubian, D.O.

Address: North Hollywood, CA

Specialty: Orthopedic Surgery

Tamorah G. Hunt, M.B.A., Ph.D.

Address: Santa Ana, CA

Specialty: Economics

Tamorah G. Hunt, M.B.A., Ph.D.

Address: Santa Ana, CA

Specialty: Economics

Tamorah G. Hunt, M.B.A., Ph.D.

Address: Santa Ana, CA

Specialty: Economics

**Defendant Expert(s)**

Christian Emerson, C.P.A.

Address: Torrance, CA

Specialty: Economics

Christian Emerson, C.P.A.

Address: Torrance, CA

Specialty: Economics

**Award:** $ 2,700,000

**Award Details:**      On Dec. 6, 2019, the jury found that Cordoba had failed to engage Quemada in the interactive process, failed to accommodate Quemada's disabilities, discriminated against Quemada because of his disabilities, failed to prevent such discrimination and wrongfully discharged Quemada in violation of public policy. However, it found that Quemada's age was not a substantial motivating reason for Cordoba's decision to discharge Quemada. The jury determined that Quemada's compensatory damages totaled $1.2 million. It also determined that Cordoba and Cordoba's employees, officers, directors and/or managing agents acted with malice, oppression and/or fraud. On Dec. 9, 2019, the jury awarded Quemada $1.5 million in punitive damages. Thus, Quemada's jury award totaled $2.7 million.



www.verdictsearch.com/index.jsp

Copyright 2020 ALM Media Properties, LLC.
All Rights Reserved
Further duplication without permission is prohibited
v19

**End of Document**

# EXHIBIT "B"

### *Wilma Ismen v. Beverly Hospital; 2008 Jury Verdicts LEXIS 29753*

BC 366 198

August 13, 2008

**Headline:** Despite Medical Restrictions, Plaintiff Said She Wanted to Work

**Published Date:** September 13, 2008

**Topic:** Employment - Failure to Accommodate - Employment - Retaliation - Employment - Wrongful Termination - Employment - Disability Discrimination - Discrimination - Perceived Disability

**Injury:** Emotional Distress, Depression, Agoraphobia

**Practice Area:** Labor and Employment Law; Torts

**State:** California

**Court:** Superior Court of Los Angeles County

**Plaintiff Counsel**

Joseph Lavi

Firm Name: Bolden & Martin

Address: Beverly Hills, CA

Plaintiff Name: (Wilma Ismen)

David M. deRubertis

Firm Name: The deRubertis Law Firm

Address: Woodland Hills, CA

Plaintiff Name: (Wilma Ismen)

**Defendant Counsel**

Joan M. Cotkin

Firm Name: Cotkin & Collins

Address: Los Angeles, CA

Defendant Name: (Beverly Hospital)

C. Edward Langhammer

Firm Name: Cotkin & Collins, P.C.

Address: Los Angeles, CA

Defendant Name: (Beverly Hospital)

**Judge:** Ernest Hiroshige

**Case Summary**

Wilma Ismen v. Beverly Hospital; 2008 Jury Verdicts LEXIS 29753

From September 1985 to Sept. 1, 2006, plaintiff Wilma Ismen, 70s at trial, worked as a medical records clerk at Beverly Hospital, a nonprofit community hospital in Montebello.

Over the course of her employment, Ismen sustained a number of work-related injuries and filed a total of eight workers' compensation claims. Three of these claims related to back injuries.

From approximately 1991 until her termination, Ismen was under relatively constant medical care for degenerative disc disease in her back, which included physical therapy and epidurals. Ismen's last work-related injury occurred in November 2004, when she fell at work, twisting an ankle and aggravating the pre-existing back condition. After the injury, Ismen took off one week of work and then worked without any medical restrictions throughout 2004 and 2005.

In March 2006 as part of the workers' compensation action relating to the November 2004 injury, Ismen underwent an examination by an agreed medical examiner, orthopedic surgeon Roger Sohn. According to Sohn's AME report, Ismen was restricted from heavy lifting, repeated bending or stooping, prolonged weight-bearing, and walking over uneven ground.

In August, Beverly Hospital received Sohn's AME report and began a process of evaluating the work restrictions in light of Ismen's job duties. Ismen's acting supervisor prepared a detailed job analysis, concluding that the job required walking six-to-eight hours per shift, bending three-to-six hours per shift, squatting three-to-six hours per shift and standing still three-to-six hours per shift. The hospital's human resource department then determined that Ismen could not perform the job given these restrictions, and that the hospital could not think of any accommodations to address the restrictions.

On Sept. 1, Ismen was called into a meeting with two hospital human resource employees and her acting supervisor to discuss the AME report, which she had not previously seen or heard. According to Ismen, she was told at the meeting that she could not do the job with the listed restrictions, but she disagreed and asserted that she could. Ismen also disputed that she was shown the documents about the job's requirements that Beverly Hospital claimed that she was shown. It was at that meeting that Ismen was terminated.

Claiming discrimination, retaliation and failure to accommodate, Ismen sued the hospital. Plaintiff's counsel argued that the AME's restrictions were not inconsistent with the job's duties or requirements, and that Ismen was able to perform the essential functions of the job with or without reasonable accommodations. The primary restriction that was an issue was "no repeated bending or stooping," which related to retrieval of medical record files from low shelves. Counsel asserted that the amount of bending or stooping required by the job did not exceed the work restrictions, and even if it did, Ismen could kneel instead of bending or stooping to retrieve files from the lower shelves, as she had no restriction on kneeling.

Ismen said that her termination,  which was based on restrictions that did not actually preclude her from doing the job, constituted discrimination based on actual or perceived disability, and that the termination decision was in retaliation for filing workers' compensation claims.

Plaintiff vocational rehabilitation expert Alessandro F. Anfuso opined that Ismen was able to perform the essential functions of her job and did not require accommodations.

Beverly Hospital denied the allegations. According to the hospital, those at the Sept. 1 meeting reviewed the job description and the AME's restrictions, and everybody (including Ismen) agreed that she could not perform the job (i.e. that the restrictions were inconsistent with the job's physical requirements and duties). The hospital claimed that no one present at the meeting could think of any accommodations, and that it reviewed available job openings with Ismen, but she was not qualified or interested in any of the open positions. Ismen was sent home after the meeting with the suggestion that she contact her lawyer or the AME doctor to seek clarification of the restrictions.

The hospital contended that its employees liked Ismen and wanted to find a way for her to work, but the restrictions were too severe and the job was too physical. The hospital was required to address the restrictions so Ismen would not experience further injury by working.

Wilma Ismen v. Beverly Hospital; 2008 Jury Verdicts LEXIS 29753

The hospital pointed to Ismen's statements to her own doctor and the AME doctor, in which the performance of physical activities aggravated her pain, and that at various times, she evaluated her pain level as eight to 10 on a scale of one to 10.

The hospital engaged in a proper interactive process, the defense argued, including spending a significant amount of time evaluating the job and restrictions before the Sept. 1 meeting, but it simply could not modify the job to allow Ismen to work.

Defense human resources policies expert Michael A. Robbins testified that the company's conduct during the Sept. 1 meeting met the standard of practice; that is, the company engaged in a proper interactive process.

The hospital further argued that the Sept. 1 meeting ended with an agreement that Ismen would return to either her lawyer or the AME doctor to seek clarification of the restrictions, but that Ismen failed to follow through, filing a lawsuit to seek money instead.

Defense counsel further contended that Ismen was a sophisticated person, having filed eight prior workers' compensation claims and having retained four different workers' compensation lawyers. Thus, if she wanted to keep her job, she knew how to address the issues raised in the Sept. 1 meeting.

**Injury Text:**

Ismen alleged depression with agoraphobia and panic attacks following her termination.

Plaintiff psychology expert Anthony E. Reading testified that Ismen's depression was exacerbated by the termination, and that she also developed agoraphobia and panic disorder, which she did not previously have.

Ismen sought approximately $430,000 for 10 years of future lost earnings, as calculated by accounting expert Susan Bleecker.

Both parties agreed that Ismen had a statistical work-life expectancy of just over one year.

Ismen said that she wanted to continue working as long as possible because she loved her job and needed her paycheck to pay her mortgage.

The hospital argued that Ismen's depression and emotional condition after the termination were no different than before the termination. Defense counsel offered medical records demonstrating a 13-year history of major depression with panic attacks beginning in 1993 following a dispute with coworkers for which Ismen filed a psych workers' compensation claim. Over those 13 years, Ismen continuously was on anti-depression medication and frequently on anti-anxiety medication.

Defense psychiatry expert Daniel Auerbach opined that Ismen was in "pathological denial of her chronic pain" and the resulting physical limitations. Auerbach agreed that the termination triggered another episode of major depression, but disagreed that Ismen had panic disorder. He said that she had panic attacks in the past.

Defense economics expert David J. Weiner claimed that Ismen's wage loss should not exceed her statistical work-life expectancy.

During the second phase of the trial, Ismen sought an unspecified amount for punitive damages and emotional distress.

The hospital contended that it had experienced ongoing financial losses between $9 million and $12 million over the last several years, and that any punitive-damage award would severely impact the operation's charitable purposes.

**Trial Length**

6.0 weeks

Wilma Ismen v. Beverly Hospital; 2008 Jury Verdicts LEXIS 29753

**Jury Deliberation**

4.5 days

| PLAINTIFF NAME | PROPERTY AWARD |
|---|---|
| Wilma Ismen | $ 1,180,164 |

**Plaintiff Amounts:**

(Wilma Ismen)

 $825,000 Personal Injury: Punitive Exemplary Damages

 $242,064 Personal Injury: FutureLostEarningsCapability

 $113,100 Personal Injury: emotional distress

**Plaintiff Expert(s)**

Alessandro F. Anfuso, M.S., C.V.E.

Address: Alhambra, CA

Specialty: Vocational Rehabilitation

Affiliation: David deRubertis, Joseph Lavi

Anthony E. Reading, Ph.D.

Address: Beverly Hills, CA

Specialty: Psychology/Counseling

Affiliation: David deRubertis, Joseph Lavi

Roger Sohn, M.D.

Address: Los Angeles, CA

Specialty: Orthopedic Surgery

Affiliation: David deRubertis, Joseph Lavi

Susan Bleecker, C.P.A.

Address: Pasadena, CA

Specialty: Accounting (Forensic)

Affiliation: David deRubertis, Joseph Lavi

**Defendant Expert(s)**

Daniel Auerbach, M.D.

Address: Encino, CA

Specialty: Psychiatry

Affiliation: C. Langhammer, Joan Cotkin

David J. Weiner, M.B.A.

Address: Los Angeles, CA

Specialty: Economics

Wilma Ismen v. Beverly Hospital; 2008 Jury Verdicts LEXIS 29753

Affiliation: C. Langhammer, Joan Cotkin

Michael A. Robbins

Address: Bell Canyon, CA

Specialty: Human Resources Policies

Affiliation: C. Langhammer, Joan Cotkin

**Award:** $ 1,180,164

**Award Details:** The jury found for Ismen on all claims: disability discrimination; failure to accommodate; and retaliation for filing workers' compensation claims in violation of public policy. The jury also found that an officer or managing agent of Beverly Hospital engaged in fraudulent, malicious or oppressive conduct.

With punitive damages, Ismen was awarded $1,180,164.



www.verdictsearch.com/index.jsp

Copyright 2008 ALM Media Properties, LLC.
 All Rights Reserved
 Further duplication without permission is prohibited
VerdictSearch
California Reporter Vol. 7

**End of Document**

# EXHIBIT "C"

### *Anahit Shirvanyan v. Los Angeles Community College District; 2018 Jury Verdicts LEXIS 36676*

BC633224

December 20, 2018

**Headline:** Kitchen Worker: Requests for Accommodation Were Ignored

**Published Date:** January 28, 2019

**Topic:** Employment - Failure to Accommodate - Employment - Disability Discrimination - Employment - Wrongful Termination

**Injury:** Depression

**Practice Area:** Labor and Employment Law

**State:** California

**Court:** Superior Court of Los Angeles County, Los Angeles

**Plaintiff Counsel**

Anthony Nguyen

Firm Name: Shegerian & Associates, Inc.

Address: Santa Monica, CA

Plaintiff Name: (Anahit Shirvanyan)

Mark I. Lim

Firm Name: Shegerian & Associates

Address: Santa Monica, CA

Plaintiff Name: (Anahit Shirvanyan)

Mahru Madjidi

Firm Name: Shegerian & Associates

Address: Santa Monica, CA

Plaintiff Name: (Anahit Shirvanyan)

**Defendant Counsel**

Charles R. Messer

Firm Name: Carlson Messer & Turner LLP

Address: Los Angeles, CA

Defendant Name: (1)

J. Grace Felipe

Firm Name: Carlson & Messer, LLP

Anahit Shirvanyan v. Los Angeles Community College District; 2018 Jury Verdicts LEXIS 36676

Address: Los Angeles, CA

Defendant Name: (1)

**Judge:** Stephanie M. Bowick

**Case Summary**

In 2014, plaintiff Anahit Shirvanyan, 60, a kitchen worker at the Child Development Center at Los Angeles Valley College, was diagnosed with moderate to severe carpal tunnel syndrome. She began to experience pain in her right hand and arm two years earlier, partially because of her active work of lifting heavy groceries and kitchen equipment. Shirvanyan claimed that, after her diagnosis, she requested accommodations on several occasions, but that the Los Angeles Community College District never engaged in the interactive process and never accommodated her. She also claimed that she complained to her supervisor about her pain, but that the supervisor reduced her hours, questioned the splint she wore, and ignored her requests for help in pushing carts and moving heavy items.

On Dec. 18, 2015, Shirvanyan injured her arm and went home early as a result of her injury. She claimed that she then submitted a doctor's note, which put her on medical leave from work for three months to deal with pain in her right hand and arm.

At the end of 2015, Shirvanyan's contract with the Los Angeles Community College District expired. Shirvanyan claimed the district let her contract expire without letting her know.

Shirvanyan sued the Los Angeles Community College District, alleging that its actions constituted disability discrimination, failure to engage in the interactive process and failure to provide reasonable accommodations.

Defense counsel contended that Shirvanyan never asked for work accommodations and that Shirvanyan's bosses did not know she had a disability. Counsel also contended that Shirvanyan abandoned her job in December 2015.

**Injury Text:**

Shirvanyan claimed that she has lost much of the use of her right arm and that she continues to suffer from major depression as a result of her treatment by her employer and supervisor.

Shirvanyan sought recovery for her past and future lost earnings. She also sought recovery of non-economic damages for her past and future pain and suffering.

**Trial Length**

15.0 days

**Jury Deliberation**

7.0 hours

| PLAINTIFF NAME | PROPERTY AWARD |
|---|---|
| Anahit Shirvanyan | $ 2,899,670 |

**Plaintiff Amounts:**

(Anahit Shirvanyan)

  $57,639 Personal Injury: past economic loss

  $67,031 Personal Injury: future economic loss

  $1,400,000 Personal Injury: past noneconomic loss

Anahit Shirvanyan v. Los Angeles Community College District; 2018 Jury Verdicts LEXIS 36676

$1,375,000 Personal Injury: future noneconomic loss

**Plaintiff Expert(s)**

Mark Falkenhagen

Address: Los Angeles, CA

Specialty: Economics

Affiliation: Mark Lim

Anthony E. Reading, Ph.D.

Address: Beverly Hills, CA

Specialty: Psychology/Counseling

Affiliation: Mark Lim, Mahru Madjidi

Mark Falkenhagen

Address: Los Angeles, CA

Specialty: Economics

Affiliation: Mahru Madjidi

Anthony E. Reading, Ph.D.

Address: Beverly Hills, CA

Specialty: Psychology/Counseling

Affiliation: Anthony Nguyen

Mark Falkenhagen

Address: Los Angeles, CA

Specialty: Economics

Affiliation: Anthony Nguyen

**Award:** $ 2,899,670

**Award Details:** The jury found that Shirvanyan was not discriminated against because of her disability. However, it found for Shirvanyan on her claims of failure to engage in the interactive process and failure to provide reasonable accommodations. The jury determined that Shirvanyan's damages totaled $2,899,670.



www.verdictsearch.com/index.jsp

Copyright 2019 ALM Media Properties, LLC.
 All Rights Reserved
 Further duplication without permission is prohibited
California Reporter Vol. 18

**End of Document**

# EXHIBIT "D"

# *Virginia Hoover v. Dignity Health, St. John's Pleasant Valley Hospital, and St. John's Healthcare Foundation Oxnard and Pleasant Valley; 2018 Jury Verdicts LEXIS 37236*

56-2016-00481136-CU-OE-VTA

December 20, 2018

**Headline:** Hospital Did Not Accommodate Her After On-the-job Injury: Plaintiff

**Published Date:** March 04, 2019

**Topic:** Employment - Failure to Accommodate - Employment - Disability Discrimination - Employment - Wrongful Termination

**Injury:** Emotional Distress

**Practice Area:** Labor and Employment Law

**State:** California

**Court:** Superior Court of Ventura County, Ventura

**Plaintiff Counsel**

Lanny M. Tron

Firm Name: Tron & Tron

Address: Camarillo, CA

Plaintiff Name: (***Virginia Hoover***)

Terry L. Tron

Firm Name: Tron & Tron

Address: Camarillo, CA

Plaintiff Name: (***Virginia Hoover***)

**Defendant Counsel**

Tyree P. Jones

Firm Name: Reed Smith LLP

Address: Washington, DC

Defendant Name: (1 St. John's Pleasant Valley Hospital, St. John's Healthcare Foundation Oxnard and Pleasant Valley)

Eniola O. Akinrinade

Firm Name: Reed Smith LLP

Address: Los Angeles, CA

Virginia Hoover v. Dignity Health, St. John's Pleasant Valley Hospital, and St. John's Healthcare Foundation
Oxnard and Pleasant Valley; 2018 Jury Verdicts LEXI....

Defendant Name: (1 St. John's Pleasant Valley Hospital, St. John's Healthcare Foundation Oxnard and Pleasant
Valley)

**Judge:** Matthew P. Guasco

**Case Summary**
On Dec. 4, 2014, plaintiff _**Virginia Hoover**_, 57, a radiologic technologist IV, was terminated from her position at St.
John's Pleasant Valley Hospital, in Camarillo.

Prior to her termination, Hoover suffered an on-the-job shoulder injury. She was cleared to return to work in August
2014 with two minor restrictions on the use of her non-dominant, left arm, including not lifting more than 15 pounds
or reaching overhead. Hoover claimed the hospital failed to accommodate her, failed to find her an alternative
position, and, instead, fired her because of her disability.

Hoover sued the operator of St. John's Pleasant Valley Hospital, _**Dignity Health**_, and St. John's Healthcare
Foundation (Oxnard and Pleasant Valley). Hoover alleged that the defendants' actions constituted a failure to
engage in an interactive process, a failure to provide reasonable accommodations, disability discrimination, a failure
to prevent discrimination, wrongful termination in violation of public policy, and a breach of implied in fact contract.

St. John's Healthcare Foundation was dismissed from the lawsuit shortly after it was filed, and Hoover dismissed
her breach of implied contract claim shortly before trial.

Hoover claimed that she could still perform the essential functions of her job and that her disability could readily be
accommodated, especially since _**Dignity Health**_ had already accommodated a similarly disabled individual with a
lifting restriction in her very same department.

Plaintiff's counsel moved to strike the defense's supplemental expert designation, and the motion was granted. As a
result, _**Dignity Health**_ had to proceed to trial with no experts.

Defense counsel contended that Hoover's disability could not be accommodated and that _**Dignity Health**_ had no
other position available for Hoover, so she was terminated.

**Injury Text:**

Hoover worked for St. John's Pleasant Valley Hospital for 24 years, and she claimed she intended to work there
until she retired, which was eight years after she was terminated. She alleged that she suffers from emotional
distress as a result of her termination.

Hoover sought recovery of past and future lost income, and damages for her past and future emotional pain and
suffering.

**Trial Length**

20.0 days

**Jury Deliberation**

1.5 days

**Jury Poll**

9-3

**Post Trial Status**

Virginia Hoover v. Dignity Health, St. John's Pleasant Valley Hospital, and St. John's Healthcare Foundation
Oxnard and Pleasant Valley; 2018 Jury Verdicts LEXI....

Plaintiff's counsel moved for prejudgment interest, and it was granted. As a result, $71,558.86 was added to the judgment, making Hoover's recovery total $1,099,826.86.

Plaintiff's counsel also moved for recovery of more than $1.4 million in attorney fees, per the Fair Employment and Housing Act, and for recovery of over $70,000 in expert costs. The motions for attorney fees and costs are pending.

| PLAINTIFF NAME | PROPERTY AWARD |
|---|---|
| _**Virginia Hoover**_ | $ 1,028,268 |

**Plaintiff Amounts:**

(_**Virginia Hoover**_)

  $433,643 Personal Injury: past economic damages

  $482,305 Personal Injury: future economic damages

  $112,320 Personal Injury: emotional distress damages

**Plaintiff Expert(s)**

Marianne Inouye, M.B.A.

Address: Pasadena, CA

Specialty: Economics

Affiliation: Terry Tron, Lanny Tron

Jan Duffy

Address: San Francisco, CA

Specialty: Human Resources Policies

Affiliation: Lanny Tron, Terry Tron

**Award:** $ 1,028,268

**Award Details:** The jury found for Hoover on all her claims, and it determined that Hoover's damages totaled $1,028,268.



www.verdictsearch.com/index.jsp

Copyright 2019 ALM Media Properties, LLC.
 All Rights Reserved
 Further duplication without permission is prohibited
California Reporter Vol. 18

**End of Document**

# EXHIBIT "E"

## *William Taylor v. City of Burbank; 2012 Jury Verdicts LEXIS 3990*

BC 422252

March 19, 2012

**Headline:** Former Deputy Police Chief: Termination Due to Retaliation

**Published Date:** April 09, 2012

**Topic:** Employment - Retaliation - Employment - Whistleblower

**Injury:** Aggravation of Existing Condition, Emotional Distress

**Practice Area:** Criminal Law and Procedure; Governments; Labor and Employment Law; Transportation Law

**State:** California

**Court:** Superior Court of Los Angeles County, Central

**Plaintiff Counsel**

Christopher Brizzolara

Firm Name: Law Office of Christopher Brizzolara

Address: Santa Monica, CA

Plaintiff Name: (William Taylor)

Gregory W. Smith

Firm Name: Law Offices of Gregory W. Smith

Address: Beverly Hills, CA

Plaintiff Name: (William Taylor)

**Defendant Counsel**

Ronald F. Frank

Firm Name: Burke, Williams & Sorensen, LLP

Address: Los Angeles, CA

Defendant Name: (City of Burbank)

Linda Miller Savitt

Firm Name: Ballard Rosenberg Golper & Savitt, LLP

Address: Glendale, CA

Defendant Name: (City of Burbank)

**Judge:** John L. Segal

**Case Summary**

In May 2009, plaintiff William Taylor, 49, was demoted from his position as deputy police chief to captain for the city of Burbank Police Department, where he had served for 25 years. Prior to the demotion, Taylor served as deputy police chief for two years. He claimed that although he was told that his demotion was a result of restructuring of the department, he believed that his demotion was in retaliation for his complaints about alleged racial discriminate

William Taylor v. City of Burbank; 2012 Jury Verdicts LEXIS 3990

within the department. He alleged that after his demotion, an internal affairs investigation was started to look into the departments handling of a burglary. Following a second investigation, he was terminated in June 2010.

Taylor sued the city of Burbank, asserting claims of retaliation and whistleblower law.

Taylor alleged that his demotion was due to retaliation against him by the department. He claimed that in 2008, the department took steps to begin terminating a small number of Hispanic and black officers who were still in their probationary or training periods. He stated that he believed that those steps were a result of racial discrimination. Taylor alleged that prior to an officer's termination, he would be consulted about officers who allegedly had no deficiencies on record that would warrant termination. He claimed he made multiple complaints to the chief of police about the threatened terminations and stopped them from occurring. Taylor claimed that after he learned he might be demoted, he reported the alleged discrimination to an outgoing member of the city council and also reported the issue to the city manager.

Taylor alleged that at or around the same time, an internal affairs investigation was looking into a previous investigation within the police department regarding the department's handling of the 2007 burglary of Porto's Bakery. The original investigation, which took place in 2008, was prompted by complaints against Lieutenant Omar Rodriguez, who was accused of using physical force against a possible witness to facts regarding the bakery burglary. The 2008 investigation, which Taylor oversaw, ultimately concluded that there was no sufficient evidence to prove that Rodriguez committed any wrongdoing. Taylor claimed that a second investigation, which began in April 2009, was then commenced in order to rid him and Rodriguez, a Hispanic officer, from the police department. The 2009 investigation determined that Taylor obstructed the original internal affairs investigation and, as as a result, he was fired in June 2010.

At trial, a former Burbank city council member testified that Taylor complained to her that the police department was firing minority police officers based on their race. The former council member also testified that three months prior to the resolution of the second internal affairs investigation, the city manager told her that the 2009 investigation would result in discipline from top to bottom of the police department.

Plaintiff's counsel presented an anonymous letter that was sent to the city council and the mayor's office in 2008, which alleged that a small group of listed officers were being subjected to name-calling and inappropriate comments, as well as other forms of discrimination due to their race or national origin.

The plaintiff's police practices and procedures expert opined that Taylor did not violate any police protocol in his role during the first investigation into the Porto's Bakery burglary, and that James Gardiner (the defense expert who conducted the second investigation into the burglary) produced no new evidence in the second investigation, which merely looked at the facts differently. Plaintiff's counsel also relied on the testimony of former Police Chief Tim Stehr, who said that he told Taylor to keep a close eye on the investigation.

The city of Burbank denied the allegations and maintained that it never terminated an officer based on his or her race or ethnicity. The city presented evidence that Taylor's reassignment from the deputy chief position was due to a departmental reorganization, wherein the then-chief of police took on a number of Taylor's previous responsibilities and the other three captains also were reassigned different duties. Taylor's rank both before and after May 2009 remained that of captain, and the deputy chief assignment was worth a monthly salary differential of $500, defense counsel noted. The current chief and deputy chief of police, as well as the outside investigator, testified to the good cause for Taylor's termination in reliance on an outside investigator's findings, and the absence of any retaliatory motive or intent. The city also disputed the claims of discrimination, maintaining that each of the alleged targeted officers of discrimination are still with the police department and were never the subject of even a threat of termination. Moreover, none of the Hispanic or black probationary officers were terminated. The city also showed that Taylor never made a written report of discrimination and disputed his claimed oral reports.

Defense counsel argued that the city demonstrated its prompt response to the anonymous letter cited by the plaintiff, which included the hiring of an outside Hispanic investigator who interviewed each of the listed officers and others, and which resulted in disciplinary action based upon the investigator's findings.

William Taylor v. City of Burbank; 2012 Jury Verdicts LEXIS 3990

Gardiner, the defense expert who conducted the second investigation into the burglary, testified that he was a retired police chief who was hired by the city attorney for Burbank to conduct the second investigation. He also testified that the chief of police was directed to allow him to conduct the investigation and that a police captain was assigned to assist him. Gardiner claimed that the findings rendered by the second investigation -- that Taylor obstructed the first investigation regarding the Porto's Bakery burglary -- was based on sufficient evidence and the statements of both the original investigators, a police captain and former chief of police. He claimed that their statements to him showed that the plaintiff lied about his obstruction of the first investigation. Gardiner further claimed that he found violations of standard protocols and new evidence in the second investigation, including an eyewitness of the use of force. He alleged that as a result, he found that Taylor manipulated the investigation by, among other things, instructing officers on how to conduct a photo line-up, which countered customary line-up configuration; restricting interviews by officers; and impugning the investigator's motives instead of replacing him with a different investigator. Thus, defense counsel maintained that the plaintiff's termination was justified.

**Injury Text:**

Taylor claimed that the demotion and subsequent termination caused him to suffer an elevation in his already high blood pressure, which the plaintiff's treating internist expert related to the defendant's alleged wrongdoing. As a result, Taylor was forced to adjust his medication, which eventually lowered his blood pressure, and he was cleared by his internist to return to work five months before he was terminated.

Plaintiff's counsel asked the jury to award Taylor non-economic damages in the amount of $3 million to $5 million. Taylor, who was four months away from turning 50, which would benefit his pension, also sought recovery of damages for his past and future lost earnings in the amounts of $1.05 million to $1.8 million.

**Trial Length**

2.0 weeks

**Jury Deliberation**

2.0 days

**Jury Composition**

5 male, 7 female

**Jury Poll**

9-3

| PLAINTIFF NAME | PROPERTY AWARD |
|---|---|
| William Taylor | $ 1,298,579 |

**Plaintiff Amounts:**

(William Taylor)

  $250,000 Personal Injury: non-economic damages

  $1,048,579 Personal Injury: economic damages

**Plaintiff Expert(s)**

Paul Kim

Address: Los Angeles, CA

Specialty: Police Practices & Procedures

William Taylor v. City of Burbank; 2012 Jury Verdicts LEXIS 3990

Affiliation: Gregory Smith

Sean Leoni, M.D.

Address: Encino, CA

Specialty: Internal Medicine

Affiliation: treating physician, Gregory Smith

Karen Smith

Address: Pasadena, CA

Specialty: Economics

Affiliation: Gregory Smith

Sean Leoni, M.D.

Address: Encino, CA

Specialty: Internal Medicine

Affiliation: treating physician, Christopher Brizzolara

Paul Kim

Address: Los Angeles, CA

Specialty: Police Practices & Procedures

Affiliation: Christopher Brizzolara

Karen Smith

Address: Pasadena, CA

Specialty: Economics

Affiliation: Christopher Brizzolara

**Defendant Expert(s)**

James Gardiner

Address: San Luis Obispo, CA

Specialty: Police Practices & Procedures

Affiliation: Ronald Frank, Linda Savitt

**Award:** $ 1,298,579

**Award Details:** On a general verdict form, the jury found in favor of Taylor and against the city. Thus, it awarded Taylor $1,298,579.

VERDICTSEARCH

www.verdictsearch.com/index.jsp

Copyright 2012 ALM Media Properties, LLC.
 All Rights Reserved
 Further duplication without permission is prohibited
VerdictSearch
California Reporter Vol. 11